# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **JESUS GUILLERMO MARTINEZ,** | ) | **NO. CV 19-9810-KS** |
| **Petitioner,** | ) | |
| **v.** | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| **NEIL McDOWELL, Warden,** | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

## INTRODUCTION

On November 15, 2019, Petitioner, a California state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. (Dkt. No. 1.)  The parties have consented to the jurisdiction of the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 2, 14.)  On April 17, 2020, Respondent filed an Answer to the Petition and lodged the relevant state court records. (Dkt. Nos. 12-13.)  On May 18, 2020, Petitioner filed a Reply. (Dkt. No. 16.)  Briefing in this action is now complete, and the matter is under submission to the Court for decision.

//

# PRIOR PROCEEDINGS

On December 8, 2017, a Los Angeles County Superior Court jury found Petitioner guilty of two counts of child abuse likely to produce great bodily injury (California Penal Code ("Penal Code") § 273a(a)); one count of vandalism (Penal Code § 594(a)); one count of resisting, delaying, or obstructing a peace officer (Penal Code § 148(a)(1)); and one count of being under the influence of a controlled substance (California Health and Safety Code § 11550(a)). (Clerks' Transcript ("CT") 53-57; 3 Reporter's Transcript ("RT") 949-51.) On January 2, 2018, the trial court found true the prosecutor's allegations that Petitioner had two prior strike convictions under the Three Strikes Law (Penal Code §§ 667(b)-(j), 1170.12(b)). (CT 122; 3 RT 1205-06.) The trial court sentenced Petitioner to 14 years and 8 months in state prison. (CT 122-25, 144-45; 3 RT 1212.)

Petitioner appealed the judgment of conviction. (Lodgment ("Lodg.") No. 3.) On January 23, 2019, the California Court of Appeal issued a reasoned, unpublished opinion in which it affirmed the judgment. (Lodg. No. 6.) Petitioner filed a Petition for Review in the California Supreme Court. (Lodg. No. 7.) On April 24, 2019, the California Supreme Court summarily denied the Petition for Review. (Lodg. No. 8.)

# SUMMARY OF THE EVIDENCE AT TRIAL

The following factual summary from the California Court of Appeal's unpublished decision on direct review is provided as background. *See also* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted by the petitioner by clear and convincing evidence).

///
///
///

2

## I. Prosecution Evidence

Maria Martinez (no relation to [Petitioner]) testified that she was driving in the area of Palmdale Boulevard and 10th Street East in Palmdale around 8:00 p.m. on July 28, 2017.  While she was at the "busy intersection," a man standing on the corner about 24 feet away caught her attention.  She identified the man in court as [Petitioner].  Martinez testified that [Petitioner] looked "uneasy," "appeared to be under the influence of something," and was pacing back and forth while moving his hands in front of his chest and talking to himself.

Martinez saw two children, a boy and a girl, standing across the street from [Petitioner], near another man.  The children appeared to be around five to seven years old.  When the light turned green, the man near the children crossed the street without them.  [Petitioner] then crossed the street toward the children, who followed him as he continued down the street.  Martinez called the sheriff's department because something about the situation "didn't look right" to her.  "[B]ased on how [[Petitioner]] appeared," Martinez "wasn't sure if it was safe for the children to follow . . . somebody that might be under the influence of something or if the children should be with him or not."

Deputy sheriff Melvin Aquino testified that he responded to Martinez's call.  When he arrived at the area of Palmdale Boulevard and 9th Street East, he saw someone matching the description Martinez had provided.  Aquino identified that person in court as [Petitioner].  Aquino stopped his car near [Petitioner] and approached him on foot.  Aquino noticed an odor of alcohol emanating from [Petitioner].  [Petitioner] was "aggressive" and did not want to talk.  [Petitioner] walked away with two small children, who were crying.

3

As Aquino tried to explain to [Petitioner] why he was there, [Petitioner] told the children not to talk to the police and "pulled the children away by their arm [sic] and crossed the street. There was no crosswalk or lights." Aquino testified that the four-or six-lane street was busy, since it was rush hour, and "cars had to stop to not run him over." Two or three cars came within "[a] couple feet" of [Petitioner] and the children, and had to stop "abruptly," as they were traveling at the "average speed limit" in excess of 25 miles per hour; there was no stop sign or light where [Petitioner] crossed the street. Aquino lost sight of [Petitioner] and the children after they crossed the street. On cross-examination, Aquino testified that at the time, he did not believe [Petitioner] had committed a crime and did not write a report of the encounter.

Approximately two hours later, at 10:40 p.m., Deputy Sheriff Cesar Vilanova and his partner, Deputy Jonsen, were on patrol in the area of Palmdale Boulevard and 10th Place East. Vilanova saw [Petitioner] walking north on 10th Place East. [Petitioner] had two small children who looked about five years old with him. Vilanova thought it was "kind of bizarre that there were two small children walking at that time of night," especially since they were "a little bit of a distance behind [Petitioner]," and "he wasn't holding them by their hands or anything." Vilanova decided to approach [Petitioner] to investigate.

As Vilanova drove the patrol vehicle toward [Petitioner], [Petitioner] "began running northbound" and "[l]eft the kids behind." The children attempted to catch up, but were about 40 feet behind [Petitioner]. Vilanova followed [Petitioner] and caught up to him after about 50 to 60 feet; the children were still trailing behind. Vilanova exited his car "and began talking to him trying to figure out what was going on, why he was running, . . . whose children [they were]." The children caught up to [Petitioner] while Vilanova was talking to him.

4

[Petitioner] told Vilanova that the children were his but was unable to state where he lived.  Vilanova testified, "I don't know if he was unfamiliar with that area or he didn't live in the area, but he would point in different directions as to where he lived, was never really able to tell me a street, an address; or if, in fact, he lived in Palmdale."  While he was talking with [Petitioner], Vilanova observed several signs that led him to conclude [Petitioner] "most likely" was under the influence of a central nervous system stimulant.  [Petitioner] spoke very rapidly but "wasn't able to carry a conversation."  He was "constantly clenching his jaw" and "would flail his body," and his pupils did not constrict in response to Vilanova's flashlight.  [Petitioner] also smelled of alcohol, though he did not exhibit any other signs of alcohol intoxication.

Vilanova talked to the children during the encounter.  He learned that the boy was six and the girl was five.  Vilanova observed that the boy "appeared to be weathered like out in the sun all day"; Vilanova observed redness in the whites of his eyes and around the bridge of his nose.  "The little girl, same thing."  Vilanova further noted that the girl "appeared she had been crying all day."  Both children were dirty and told Vilanova they were hungry.  At some point during Vilanova's conversation with the children, [Petitioner] yelled at them to run away and go home; the children began crying.

Three women came out of a nearby apartment building.  Two of them, Shanita and Carol, said they recognized the children and brought out some food for them.  The children ate the food quickly.  They told Vilanova that [Petitioner] was their father and that they lived with him.  Neither child knew where they lived, or where they were going that evening.  They said they were "just out running around."  Vilanova noticed that the boy had a "small abrasion" about two inches long on his wrist.  The boy told Vilanova he had sustained the wound earlier in

5

the day as he jumped over a fence while running away from the police.  The boy said the fence was taller than Vilanova, who estimated the fence to be about seven feet high.  Vilanova made arrangements for the children to be transported to the Palmdale sheriff's station and transported [Petitioner] to the jail.

## II.  Defense Evidence

[Petitioner] testified as the sole defense witness.  He acknowledged that he had a criminal record and was on probation on July 28, 2017.  On that day, he was out with his six-year-old son and five-year-old daughter.  He was their custodial parent and had enrolled them in school earlier in the day.  He was feeling "great" and "proud," because he "was taking care of business as best I can."  The family lived in a two-bedroom apartment, and [Petitioner] provided the children with food and clean clothing that day.  [Petitioner] loved his children and was "very, very careful" with them.  He did not believe he did anything to endanger them.

[Petitioner] waited until the evening to take the children outside because it was very hot during the daytime.  They were going to visit his acquaintances, Carol and Shanita, whom he expected to give them a ride home.  [Petitioner] had not been drinking that day and was not under the influence of any illegal drugs or prescription medicine.

[Petitioner] first encountered sheriff's deputies when he was in an "alleyway" near Carol and Shanita's apartment building; he did not recall having an encounter with a deputy earlier that day and denied that he and the children previously ran away from a deputy.  [Petitioner] explained that Martinez had misidentified him earlier in the day: "When the lady said that there was a guy pacing back and forth, that was an acquaintance. . . . He was just there across the

street.  I was with my children.  I remember him coming across the street to help me with my children to cross the street.  So that was not even me, the person that was pacing supposedly back and forth when Ms. Martinez supposedly made a call."

When [Petitioner] was near Carol and Shanita's building, he saw a vehicle with no lights on approaching the wrong way down the one-way alley. [Petitioner] did not know how to react, so he ran.  Because he taught his children "military" and "boy scout stuff," and often played "racing" with them, they "automatically" ran when he said to run.  He never told his children not to talk to or run from police; their mother taught them that.

[Petitioner], who had had previous "unpleasant experiences" with law enforcement, was "confused" when the deputies approached him.  They told him they were responding to a 911 call and asked him why he was running and putting his children in danger.  They also told him they were going to take his children, while they were in earshot.

On cross-examination, [Petitioner] admitted that he was not permitted to drink alcohol or use drugs while on probation.  [Petitioner] denied suffering a conviction for attempted robbery, but ultimately stipulated to committing that and two other felony offenses.

(Lodg. No. 6 at 3-8.)

## PETITIONER'S HABEAS CLAIM

Petitioner presents the following ground for habeas relief in his Petition:

7

1  "Insufficient evidence for felony child endangerment, in violation of the 5th and 14th

2  Amendments."  (Dkt. No. 1 at 5.)[1]

3

4  ## STANDARD OF REVIEW

5

6  ### I.   The Antiterrorism And Effective Death Penalty Act

7

8  Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death

9  Penalty Act of 1996 ("AEDPA"), a state prisoner whose claim has been "adjudicated on the

10  merits" cannot obtain federal habeas relief unless that adjudication:  (1) resulted in a decision

11  that was contrary to, or involved an unreasonable application of, clearly established Federal

12  law, as determined by the Supreme Court of the United States; or (2) resulted in a decision

13  that was based on an unreasonable determination of the facts in light of the evidence presented

14  in the State court proceeding.

15

16  For the purposes of Section 2254(d), "clearly established Federal law" refers to the

17  Supreme Court holdings in existence at the time of the state court decision in issue.  *Cullen v.*

18  *Pinholster*, 563 U.S. 170, 182 (2011); *see also Kernan v. Cuero*, ___ U.S. ___, 138 S. Ct. 4, 9

19  (2017) (*per curiam*) ("[C]ircuit precedent does not constitute clearly established federal

20  law . . . [n]or, of course, do state-court decisions, treatises, or law review articles[.]") (internal

21  quotation marks and citations omitted).  A Supreme Court precedent is not clearly established

22  law under § 2254(d)(1) unless it "squarely addresses the issue" in the case before the state

23  court or establishes a legal principle that "clearly extends" to the case before the state court.

24

---

25  [1]   In his Reply, Petitioner raises an additional claim challenging the trial court's decision to impose consecutive,
26  rather than concurrent, sentence terms.  (Dkt. No. 16 at 7, 8-11.)  Because Petitioner raised this claim for the first time in
   the Reply, he did not properly raise it here.  *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) ("A Traverse
27  is not the proper pleading to raise additional grounds for relief.").  In any event, the claim is not cognizable on federal
   habeas review.  *See id.* ("The decision whether to impose sentences concurrently or consecutively is a matter of state
28  criminal procedure and is not within the purview of federal habeas corpus.").  Thus, habeas relief is not warranted for this
   claim.

8

*Moses v. Payne*, 555 F.3d 742, 760 (9th Cir. 2009); *see also Harrington v. Richter*, 562 U.S. 86, 101 (2011) (holding that it "is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by" the Supreme Court) (citation omitted).

A state court decision is "contrary to" clearly established federal law under § 2254(d)(1) only if there is "a direct and irreconcilable conflict," which occurs when the state court either (1) arrived at a conclusion opposite to the one reached by the Supreme Court on a question of law or (2) confronted a set of facts materially indistinguishable from a relevant Supreme Court decision but reached an opposite result. *Murray v. Schriro*, 745 F.3d 984, 997 (9th Cir. 2014) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application" of clearly established federal law under Section 2254(d)(1) if the state court's application of Supreme Court precedent was "objectively unreasonable, not merely wrong." *White v. Woodall*, 572 U.S. 415, 419 (2014). The petitioner must establish that "there [can] be no 'fairminded disagreement'" that the clearly established rule at issue applies to the facts of the case. *See id.* at 1706-07 (internal citation omitted). Finally, a state court's decision is based on an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d)(2) when the federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record before the state court." *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir.) (internal quotation marks omitted), *cert. denied*, 574 U.S. 1041 (2014). So long as "'[r]easonable minds reviewing the record might disagree,'" the state court's determination of the facts is not unreasonable. *See Brumfield v. Cain*, 576 U.S. 305, 2277 (2015).

AEDPA thus "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *White v. Wheeler*, __ U.S. __, 136 S. Ct. 456, 460 (2015) (*per curiam*) (internal quotation marks and citation omitted). Petitioner carries the burden of proof. *See Pinholster*, 563 U.S. at 181.

9

1

2

**II.     The State Court Decision On Petitioner's Claim Is Entitled To AEDPA Deference.**

3

Petitioner raised his claim on direct review in the California Court of Appeal.  (Lodg. No. 3 at 22-32.)  The California Court of Appeal denied the claim in a reasoned decision on the merits.  (Lodg. No. 6 at 8-14.)  Petitioner then presented the claim to the California Supreme Court in the Petition for Review (Lodg. No. 7 at 11-20), which the California Supreme Court denied summarily without comment or citation to authority (Lodg. No. 8). Thus, § 2254(d) applies, and the Court looks through the California Supreme Court's summary denial to the last reasoned decision – the decision of the California Court of Appeal on direct review – to determine whether the state court's adjudication of Petitioner's claim is unreasonable or contrary to clearly established federal law.  *See Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013) ("Consistent with our decision in *Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991), the Ninth Circuit 'look[ed] through' the California Supreme Court's summary denial of [the petitioner's] petition for review and examined the California Court of Appeal's opinion."); *see also Jones v. Harrington*, 829 F.3d 1128, 1136 (9th Cir. 2016) (looking through California Supreme Court's summary denial of a petition for review to the California Court of Appeal's decision on direct review).

**DISCUSSION**

**A.     Legal Standard.**

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  When a habeas petitioner challenges the sufficiency of the evidence supporting the jury's verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*

10

*v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2012) (*per curiam*) ("question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality."). *Jackson* does not require that the prosecutor affirmatively "'rule out every hypothesis except that of guilt.'" *Wright v. West*, 505 U.S. 277, 296 (1992) (citation omitted). Further, "'[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted). When the factual record supports conflicting inferences, the federal court must presume, even if it does not affirmatively appear on the record, that the trier of fact resolved any such conflicts in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326; *McDaniel v. Brown*, 558 U.S. 120, 133 (2010). Ultimately, for Petitioner's claim to be successful, the jury's finding must be "so insupportable as to fall below the threshold of bare rationality." *Coleman*, 566 U.S. at 656.

When, as here, both *Jackson* and AEDPA apply to the same claim, the claim is reviewed under a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (*per curiam*). Accordingly, this Court's inquiry is limited to whether the California courts' rejection of Petitioner's insufficiency of the evidence claims was an objectively unreasonable application of *Jackson*. *See Emery v. Clark*, 643 F.3d 1210, 1213-14 (9th Cir. 2011); *Juan H. v. Allen*, 408 F.3d 1262, 1275 n.13 (9th Cir. 2005).

### B.     California Law On Child Endangerment.

"The *Jackson* standard 'must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011) (quoting *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004)). In its reasoned decision, the California Court of Appeal set out the substantive standard for the crime of child abuse likely to produce great bodily injury (*i.e.*, child endangerment):

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Section 273a, subdivision (a) provides: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years."

The statute is intended to protect children from abusive situations in which the probability of serious injury is great.  (*People v. Valdez* (2002) 27 Cal.4th 778, 784 (*Valdez* ).)  It prohibits both active conduct, such as directly assaulting a child, and passive conduct, such as endangering a child through extreme neglect.  (*Ibid*.)  "'The number and kind of situations where a child's life or health may be imperiled are infinite. . . . Thus, reasonably construed, the statute condemn[s] the intentional placing of a child, or permitting him or her to be placed, in a situation in which serious physical danger or health hazard to the child is reasonably foreseeable.' [Citation.]"  (*People v. Hansen* (1997) 59 Cal.App.4th 473, 479.)  The child need not actually suffer great bodily injury for the statute to be violated.  (*Valdez*, *supra*, 27 Cal.4th at p. 784.)

(Lodg. No. 6 at  9-10.)

Petitioner specifically claimed, here and in the state courts, that the evidence was insufficient in two respects:  it failed to show that he exposed his children to circumstances likely to produce great bodily harm or death, and it failed to show that he acted with criminal negligence.  (Dkt. No. 1 at 5; Lodg. No. 3 at 23-32.)  The California Court of Appeal set out the substantive standards for the two requirements:

12

The trier of fact determines whether the circumstances or conditions of the incident are such that great bodily injury is likely.  (*People v. Clark* (2011) 201 Cal.App.4th 235, 245.)  "[C]ircumstances and conditions a reasonable jury could consider include, but are not limited to, (1) the characteristics of the victim and the defendant, (2) the characteristics of the location where the abuse took place, (3) the potential response or resistance by the victim to the abuse, (4) any injuries actually inflicted, (5) any pain sustained by the victim, and (6) the nature and amount of force used by the defendant."  (*Ibid*., fn. omitted.)  The term "likely" as used in section 273a, subdivision (a) "means a substantial danger, i.e., a serious and well-founded risk."  (*People v. Wilson* (2006) 138 Cal.App.4th 1197, 1204.)

"[C]riminal negligence is the appropriate standard when the act is intrinsically lawful, such as leaving an infant with a babysitter, but warrants criminal liability because the surrounding circumstances present a high risk of serious injury."  (*Valdez*, *supra*, 27 Cal.4th at p. 789.)  Criminal negligence is aggravated, culpable, gross or reckless conduct that so departs from that of the ordinarily prudent or careful person under the same circumstances as to be incompatible with a proper regard for human life.  (*Id*. at p. 783.)  A defendant may be found criminally negligent when a reasonable person in his or her position would have been aware of the risk involved; he or she need not have a subjective awareness of the risk.  (See *id*. at pp. 783, 790.)

(Lodg. No. 6 at 10-11.)

//

//

//

//

//

13

C.      **Analysis.**

1.      **Circumstances Like to Produce Great Bodily Harm or Death.**

The California Court of Appeal first rejected Petitioner's contention that he did not expose his children to circumstances like to produce great bodily harm or death:

> [Petitioner] emphasizes that he held his children's arms as he crossed the busy street, that the cars on the street were able to stop without hitting them, and that Aquino did not believe a criminal offense had occurred at the time. These contentions are not persuasive.

> Taken in the light most favorable to the verdict, the evidence showed that [Petitioner], while under the influence of an unknown substance or substances, grabbed his small children and crossed a busy street at dusk. Multiple cars stopped short to avoid the trio, who were not in a crosswalk or near a stop sign. The fact that the cars were able to stop is not relevant; traffic moving quickly through an area without a crosswalk or stop sign poses an objectively serious risk of substantial danger to pedestrians. A reasonable jury could have concluded that the children's small statures made them even less visible to drivers, particularly when the children were not in control of their own movement or in a position to exercise safety precautions.

> [Petitioner] further argues that there was no evidence that the children faced a likelihood of substantial injury later that night, at the time of the encounter with Vilanova. We disagree. The evidence also showed that [Petitioner] allowed his hungry, sun-weathered small children to trail some 40 feet behind him on a dark street late at night. Even though the children did not know where they were going,

14

[Petitioner] immediately abandoned them when an unknown vehicle approached. The children had to run at top speed to relocate their father, who was unable to respond to basic questions and demonstrated negligible concern for their safety. A reasonable jury could conclude that these circumstances also likely posed a well-founded risk of great bodily injury to the children.

At bottom, [Petitioner] contends that the convictions should not be upheld here because "[t]he circumstances here pale in comparison to cases where appellate courts have held that the defendant placed their [sic ] children in danger of great bodily injury or death." He directs us to several cases which he accurately characterizes as having "extreme facts where the children faced dire circumstances." The existence of these more severe cases does not negate the dangerous nature of [Petitioner's] conduct here. "When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) The pertinent question is whether a reasonable jury could conclude [Petitioner] willfully exposed his children to circumstances likely to cause them bodily harm, not whether [Petitioner's] conduct was more or less egregious than that found sufficient in other cases involving different facts and circumstances.

(Lodg. No. 6 at 11-13.)

The California Court of Appeal's rejection of this part of Petitioner's claim was not objectively unreasonable, as to either of the two incidents. As to the street-crossing incident, Deputy Aquino testified that Petitioner, while smelling of alcohol (2 RT 373), pulled his small children by their arms to cross a busy street at dusk without a crosswalk or lights (2 RT 375, 704). Deputy Aquino further testified that two or three cars stopped abruptly and came within

15

"a couple feet" of hitting Petitioner and the children.  (2 RT 703-04.)  A rational jury could infer from the evidence that, as to this incident, Petitioner placed his children in circumstances likely to produce great bodily harm or death.

Petitioner contends that Deputy Aquino played a role in the street-crossing incident: while Petitioner was crossing the street with the children, Deputy Aquino allegedly called out and made gestures to him, causing Petitioner to delay the crossing and then finish it against a red light. (Dkt. No. 1 at 14; Dkt. No 16 at 18-19.)  Petitioner's contention, however, is contrary to the testimony heard by the jury.  Petitioner testified that he had no recollection or awareness of Deputy Aquino.  (2 RT 730, 732.)  And Detective Aquino testified that Petitioner walked away from him before crossing the street with the children, without a cross walk or lights.  (2 RT 373-75.)  Thus, Petitioner's contentions about what Deputy Aquino supposedly did and about how Petitioner crossed the street do not call into question the California Court of Appeal's conclusion that the evidence was sufficient for a jury to find that Petitioner placed his children in circumstances likely to produce great bodily harm or death.

As to the second incident later that evening, Deputy Vilanova testified that Petitioner was walking down a street at 10:40 p.m. with his young, hungry, sun-weathered small children trailing behind him.  (2 RT 652, 654, 666, 675.)  Deputy Vilanova further testified that Petitioner left the children behind, in an unfamiliar neighborhood, to run away from Deputy Vilanova's vehicle (2 RT 654) and, once caught, could not answer basic questions such as where he lived (2 RT 658).  A rational jury could infer from the evidence that, as to the second incident, Petitioner placed his children in circumstances likely to produce great bodily harm or death.

Petitioner contends that Deputy Vilanova approached Petitioner and the children "in a speeding vehicle that had no headlights on." (Dkt. No. at 15.)  But the jury heard Petitioner's testimony to that effect (2 RT 735) and presumably rejected it.  "The reviewing court must

16

respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).  And even assuming that the jury believed Petitioner's testimony about how Deputy Vilanova's vehicle approached him, it would not have prevented the jury from drawing a reasonable inference that Petitioner still endangered his children, by taking them to that location in the first instance and then by running away without them.

Finally, Petitioner contends that other child endangerment cases in California involved "circumstances much more dire than those here" and cites examples of such cases to illustrate that his conduct, in comparison, did not rise to the level of placing his children in circumstances posing a risk of substantial injury or death.  (Dkt. No. 16 at 14-16.)  But the California Court of Appeal explicitly rejected this comparison, concluding that the "existence of these more severe cases does not negate the dangerous nature of [Petitioner's] conduct here."  (Lodg. No. 6 at 12-13.)  Because the California Court of Appeal has spoken on the issue, Petitioner's contention that his conduct was not a crime under California law affords no basis for federal habeas relief under *Jackson*.  *See Johnson v. Montgomery*, 899 F.3d 1052, 1059 (9th Cir. 2018) (finding no *Jackson* violation where a federal habeas petitioner who "questions whether [the] uncontested facts are legally sufficient to satisfy the requirements under California law" involves "a question about what state law requires, on which the state court has spoken") (citing *Estelle v. McGuire*, 502 U.S. 62, 63 (1991)); *see also Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law").

In sum, the evidence presented at Petitioner's trial permitted a rational jury to conclude that he exposed his children to circumstances likely to produce great bodily harm or death, despite Petitioner's contentions to the contrary.  The California Court of Appeal's rejection of this part of Petitioner's claim did not involve an unreasonable application of the *Jackson* standard.

### 2.   Criminal Negligence.

The California Court of Appeal next rejected Petitioner's argument that there was insufficient evidence that he acted with criminal negligence:

> [Petitioner] contends that his conduct was not incompatible with a proper regard for human life.  At worst, he asserts, he made some parenting mistakes and was ignorant of the potentially adverse effects of his acts.

> The evidence supports the jury's finding to the contrary.  A reasonable person would be aware that dragging small children across a large, busy street outside of a crosswalk or near a stop sign is objectively dangerous.  The danger was compounded by the time of day — dusk and rush hour — as well as [Petitioner's] altered mental state and the presence of swiftly moving cars in the immediate vicinity.  A reasonable person similarly would be aware that leaving two young children alone on a dark street late at night with an oncoming car is reckless and presents a high risk of serious injury to them.

> [Petitioner] again emphasizes that he held onto his children — by their arms — and further asserts that there was no proof the children saw him use drugs, or that his altered state itself posed harm to them.  Holding one's children by the arms while crossing a street in front of moving traffic makes at best a marginal reduction in the serious risk involved to the children.  Likewise, even if [Petitioner] ingested a central nervous system stimulant outside his children's presence, that would not shield his children from the potentially hazardous effects of his resultant poor decision-making.

(Lodg. No. 6 at 13-14.)

18

The California Court of Appeal's rejection of this part of Petitioner's claim was not objectively unreasonable. The evidence showed that Petitioner, while under the influence, dragged his small children across a busy street at dusk without a crosswalk or signal. (2 RT 373-75, 702-04.) The evidence also showed that, later in the evening, Petitioner abandoned his children on a dark, unfamiliar street while he ran away from a police car. (2 RT 654-58, 678.) From this evidence, a rational jury could infer that Petitioner acted with criminal negligence by placing his children in circumstances presenting a high risk of serious injury.

Finally, Petitioner contends that his case demonstrated careless parenting mistakes that "pale in comparison" to other child endangerment cases and was unprecedented among other such cases in California. (Dkt. No. 16 at 22-24.) But, as noted, "[t]hat is a question about what state law requires, on which the state court has spoken." *See Johnson*, 899 F.3d at 1059. Moreover, Petitioner has not cited any California caselaw holding that evidence comparable to the evidence from his trial would fall short of proving criminal negligence. Indeed, as the California Court of Appeal noted, under California law, the "number and kind of situations where a child's life or health may be imperiled are infinite." (Lodg. No. 6 at 10 (quoting *Hansen*, 59 Cal. App. 4th at 479).) Thus, Petitioner is not entitled to relief for his contention that the California Court of Appeal's adjudication of his claim was incompatible with California precedent. *See Johnson*, 899 F.3d at 1059 n.1 (state court's rejection of *Jackson* claim was not objectively unreasonable, even though it involved a "slightly novel application" of state law, because it was "not so discordant [with prior California precedent] as to undermine the fundamental federal right to proof of every element beyond a reasonable doubt" and because "[n]othing in the prior caselaw prohibited application" of the state criminal statute to the facts of the case).

In sum, the evidence presented at Petitioner's trial permitted a rational jury to conclude that he acted with criminal negligence, despite his contentions to the contrary. The California

19

1    Court of Appeal's rejection of this part of Petitioner's claim did not involve an unreasonable

2    application of the *Jackson* standard.

3

4                                        **ORDER**

5

6            For all of the foregoing reasons, IT IS ORDERED that (1) the Petition is denied; and

7    (2) Judgment shall be entered dismissing this action with prejudice.

8

9    DATED: May 28, 2020

10

11                                                                KAREN L. STEVENSON
12                                                          UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28